# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| HATTIE PHELPS, | |
| *Plaintiff*, | Case No. 1:24-cv-03411 |
| v. | |
| ISOMEDIX OPERATIONS, INC., COSMED GROUP, INC. and VANTAGE SPECIALTY CHEMICALS, INC., | |
| *Defendants*. | |

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Hattie Phelps brings this First Amended Complaint and Demand for Jury Trial against Defendants Isomedix Operations, Inc. ("Isomedix"), Cosmed Group, Inc. ("Cosmed"), and Vantage Specialty Chemicals, Inc. ("Vantage") (together "Defendants"), for causing Mrs. Phelps to develop cancer. Plaintiff alleges that Defendants negligently polluted the air in her neighborhood with large amounts of ethylene oxide ("EtO"), a colorless and odorless but highly carcinogenic gas. Plaintiff further alleges that these carcinogenic EtO emissions caused her breast cancer. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters upon information and belief.

**INTRODUCTION**

1. Defendants are industrial users and polluters of ethylene oxide gas in Illinois. Isomedix and Cosmed are industrial medical device sterilizers and Vantage is a chemical producer.

2. While ethylene oxide ("EtO") has been classified as a human carcinogen since 1994, and its carcinogenic and mutagenic properties have been well documented in studies since at least the mid-1980s, Defendants disregarded ethylene oxide's harmful properties and continued

to release it into the surrounding suburban communities—until recently entirely unbeknownst to area residents and workers.

3.     Self-reported emission estimates from these facilities reflect high levels of ethylene oxide release. The combined ethylene oxide emissions from these facilities have reached as high as 13,000 pounds per year. While some EtO emissions are from controlled sources, the majority of these emission estimates are "fugitive emissions" that escape the facilities as they use EtO.

4.     Initial air monitoring tests commissioned by the Lake County Health Department, the Village of Gurnee, and the City of Waukegan demonstrated to the public the widespread nature of the ethylene oxide pollution taking place. The tests show the presence of toxic ethylene oxide gas as far as 4.8 miles from the Isomedix and Cosmed facility and 4 miles from the Vantage facility, much further than previously suspected.

5.     As a result, individuals living and working near these EtO-emitting facilities face some of the highest long-term cancer risks in the United States. These individuals have been inhaling ethylene oxide on a routine basis for decades. Now they are suffering from a variety of cancers, miscarriages, birth defects, and other life-altering health effects from their regular exposure to ethylene oxide.

## **THE PARTIES**

6.     Plaintiff Hattie Phelps is a natural person and a resident of the State of Illinois.

7.     Defendant Vantage Specialty Chemicals, Inc. and its predecessors have operated and continue to operate a chemical production facility in Gurnee, Illinois since at least 2003 ("the Gurnee Facility"). Vantage Specialty Chemicals, Inc. is a privately-held company headquartered at 4650 South Racine Avenue in Chicago, Cook County Illinois. Defendant is authorized to transact business in this county and is doing business in this county.

8.      Defendant Isomedix Operations, Inc.'s predecessors operated a sterilization facility in Waukegan, Illinois (the "Waukegan Facility") between January 2005 to September 2008. Isomedix is a privately held corporation headquartered at 5960 Heisley Road, Mentor, Ohio 44060. On January 1, 2015, Steris Isomedix Services Inc. merged with and into Isomedix Operations, Inc., a wholly owned subsidiary of Steris Corporation, with Isomedix Operations, Inc. surviving the merger. Isomedix Operations, Inc. is the successor to Steris Isomedix Services Inc., which no longer exists as a legal entity.

9.      Defendant Cosmed Group, Inc. operated the Waukegan Facility prior to 2005. Cosmed is a privately-held corporation headquartered at 28 Narragansett Avenue, Jamestown, Rhode Island, 02835.

## COMMON FACTUAL ALLEGATIONS

### I.      Brief Overview of the Ethylene Oxide Industry

10.      Ethylene oxide is a flammable gas at room temperature that is produced in large volumes for industrial uses. There are two primary known industrial uses for ethylene oxide at Defendants' facilities: medical equipment sterilization and chemical production.

11.      Commercial medical equipment sterilizers use the ethylene oxide sterilization process on over 20 billion health care products every year in the United States. The EtO sterilization process begins by placing medical equipment in a gas chamber. After air is pumped out of the room, ethylene oxide is introduced and allowed to diffuse into the products for several hours. Once the medical equipment is sterilized, the ethylene oxide is pumped out of the chamber and the remaining EtO is allowed to slowly dissipate from the equipment.

12.      Concerning chemical production, EtO undergoes a chemical reaction to create new chemical compounds. Ethylene glycol is one of the most common chemicals synthesized from ethylene oxide and is often used in a wide range of products such as polyester fibers (for use in

3

clothing, carpets, and upholstery), industrial coolants, antifreeze, and personal care products such as cosmetics, shampoos, body washes, and other skincare products.

13.     Defendants use and/or have used ethylene oxide in their industrial processes. Between approximately 1993 and 2005, Cosmed operated the Waukegan Facility, which used EtO for industrial medical device sterilization, until Isomedix took over the facility in 2005. Isomedix operated the Waukegan Facility, which used EtO for industrial medical device sterilization, from January 2005 until 2008. Vantage and its predecessors have used, and Vantage continues to use, EtO in chemical production at its Gurnee Facility since at least 1987.

14.     Throughout the industrial processes described above, EtO is emitted in both "controlled" emissions through known points of exit from the facilities (i.e., smokestacks or vents), as well as through "fugitive" emissions: unregulated escapes of EtO through leaky seals, old or malfunctioning equipment, operator error, or other untracked sources.

15.     Through their processes, these plants emitted EtO into the air, allowing it to disperse and be carried by wind throughout the area surrounding the facilities. Indeed, Lake County recently conducted EtO air monitoring tests, discussed below, demonstrating that EtO emissions have traveled as far as 4.8 miles from the Waukegan Facility and 4 miles from the Gurnee Facility.

16.     As such, local residents and workers in the area have unknowingly been exposed to carcinogenic ethylene oxide for decades. All Defendants knew, or should have known, EtO to be dangerous, toxic, carcinogenic, mutagenic, and the cause of various illnesses.

## II.     Health Effects of Ethylene Oxide Exposure

17.     Ethylene oxide is dangerous, toxic, carcinogenic, and mutagenic. EtO is highly reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily

distributed throughout the human body. Its deleterious properties have been widely known in the industries that use it for decades.

18.     In a 1977 article, the National Institute of Occupational Safety and Health ("NIOSH") concluded that occupational exposure to ethylene oxide may increase the frequency of genetic mutations in humans. The NIOSH report also raised a concern about potential carcinogenicity of ethylene oxide.

19.     In 1981, the NIOSH released a subsequent report which recommended that EtO be regarded in the workplace as a potential occupational carcinogen. The NIOSH based its recommendation on new evidence of EtO's carcinogenic, mutagenic, and reproductive hazards including studies demonstrating that EtO induced cancer in experimental animals. Specifically, the studies showed an increase in instances of leukemia in line with the increase of EtO concentrations, in addition to other adverse effects on reproductive health. An epidemiological investigation of Swedish workers exposed to EtO also revealed an increase number of leukemia and other cancers.

20.     The 1981 NIOSH report was widely disseminated in the form of a bulletin available to users and emitters of ethylene oxide and the petrochemical industry at large. Indeed, NIOSH requested that producers, distributors, and users of EtO further disseminate the bulletin and inform others of the chemical's dangers: "[o]n the basis of this information, NIOSH requests that producers, distributors, and users of ethylene oxide, and of substances and materials containing ethylene oxide, give this information to their workers and customers, and that professional and trade associations and unions inform their members."

21.     In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

5

22.     In the early 1990s, the NIOSH published the largest and most informative epidemiological study of ethylene oxide. The study analyzed over 18,000 employees working with EtO at 14 different industrial facilities sterilizing medical equipment and food spices. The study found sufficient evidence to support a causal link between exposure to ethylene oxide and increased mortality from lymphatic and hematopoietic cancers. Follow-up studies have additionally demonstrated an association between EtO exposure and breast cancer.

23.     As a result of these findings, the World Health Organization ("WHO") listed EtO as a Group 1 human carcinogen in 1994, the agency's highest risk classification, finding ethylene oxide to be carcinogenic to humans. In 2000, the U.S. Department of Health and Human Services revised its classification for EtO to "known to be a human carcinogen." In 2016, the U.S. Environmental Protection Agency's Integrated Risk Information System reclassified EtO as carcinogenic to humans and increased the cancer potency of EtO by 30 times. Critically, these classifications are not limited to the workplace: EtO is carcinogenic and harmful to those who ingest it even if they don't work with it on a regular basis. The draft December 2020 Toxicological Profile for Ethylene Oxide submitted for public comment by the Agency for Toxic Substances and Disease Registry, for example, recognizes that those living near facilities that use EtO may face elevated concentrations because of emissions or accidental releases. Indeed, as described below, it is precisely because EtO is carcinogenic regardless of circumstance that it is recognized as a toxic air pollutant whose emissions must be tracked and its release into the atmosphere (and consequential exposure to nearby properties) limited.

24.     Exposure to ethylene oxide has been widely studied and its negative health effects are well documented. Presently, there is evidence linking ethylene oxide exposure to increased risk of lymphohematopoietic cancer such as non-Hodgkin's lymphoma, myeloma, and

lymphocytic leukemia; breast cancer; tumors in the lungs, uterus, and the brain; and reproductive and developmental impairments including increased rate of miscarriages and infertility.

25. Most recently, the Illinois Department of Public Health ("IDPH") conducted an assessment of cancer rates in the population surrounding the Sterigenics facility in Willowbrook, Illinois that has been using and emitting EtO in its industrial sterilization process since 1984. The findings reaffirmed the decades of studies on EtO exposure. The IDPH found elevated cases of:

- Hodgkin's lymphoma;
- Pediatric lymphoma;
- Breast cancer;
- Prostate cancer;
- Pancreatic cancer;
- Ovarian cancer; and
- Bladder cancer.

26. Worst of all, ethylene oxide exposure affects the most vulnerable members of the population. The U.S. Environmental Protection Agency ("U.S. EPA") states that "for a single year of exposure to ethylene oxide, the cancer risk is greater for children than for adults. That is because ethylene oxide can damage DNA."

**III.    Defendants Knew For Decades That EtO Emissions Were Harmful**

27. By the early 1980s, ethylene oxide's negative health effects were widely disseminated to industrial users and emitters of the chemical. Consequently, Defendants knew or should have known that ethylene oxide is and was always dangerous to human health and that its emissions posed (and continue to pose) a serious risk to area residents.

28. In 1981, the National Institute for Occupational Safety and Health ("NIOSH") published a "current intelligence bulletin" recommending that EtO "be regarded in the workplace

7

as a potential occupational carcinogen, and that appropriate controls be used to reduce worker exposure. That bulletin was widely circulated amongst all industrial users of EtO, with one prominent EtO sterilizer, Sterigenics, circulating an internal memorandum describing the bulletin as "another nail in the coffin" of EtO sterilization.

29.     In October 1985, the U.S. EPA issued a Notice of Intent to list EtO as a hazardous air pollutant. The Notice expressed concern over the "adverse health effects associated with ethylene oxide exposure" and cited the various studies on EtO's carcinogenic health effects. In this Notice, the U.S. EPA also stated that it performed a dispersion model to estimate the concentration levels which the public may be exposed near EtO emission sources and conducted a preliminary risk assessment. The U.S. EPA's preliminary risk assessment found that there was a risk of an additional 47 cases of cancer per year in areas surrounding EtO sterilizers and fumigators and concluded that "ethylene oxide can exist in the ambient air for at least several hours, a sufficient length of time for a significant human exposure to occur."

30.     In July 1986, when considering adding "ethylene oxide (EO) to the list of hazardous air pollutants" the U.S. EPA issued a letter to ethylene oxide users requesting "information about E[t]O sterilization processes, E[t]O emission levels from sterilizers, and emission controls on E[t]O sterilizers at each of your facilities that uses E[t]O for sterilization or fumigation." This request came in light of the NIOSH study showing evidence of EtO's carcinogenic, mutagenic, and reproductive hazards and the U.S. EPA's concern with "significant quantities of EO [being emitted] to the atmosphere" and, consequently, affecting individuals living and working near ethylene oxide facilities. The U.S. EPA sent the July 1986 letter to various EtO users and emitters, including Medline Industries. Ultimately, ethylene oxide was included on the original list of hazardous air pollutants identified in the 1990 Amendment to the Clean Air Act.

31.     By 1990 then, ethylene oxide users and emitters were well aware of the dangers of the chemical and legal consequences of emissions. Indeed, in 1990 California Attorney General Van de Kamp brought a lawsuit against four emitters of ethylene oxide alleging that the EtO emitters had exposed an estimated 3 million people living near emissions sites to the potent carcinogen.

32.     The Defendants in this action, however, continued to emit large quantities of ethylene oxide (as discussed below) notwithstanding these known dangers. Cosmed Group, for example, agreed to pay $1.5 million in 2005 for Clean Air Act violations arising from six of its eight facilities, including the Waukegan Facility. According to the U.S. EPA, Cosmed's "violations are thought to have occurred from at least 1998 until 2003" for its 30 tons of *excess* emissions across three facilities combined, including its Waukegan Facility. This violation led Cosmed to sell the Waukegan Facility to Defendant Isomedix. On information and belief, Defendant Isomedix was aware of the previous Clean Air Act violations at the Waukegan Facility at the time it purchased that facility from Defendant Cosmed Group.

33.     Prior to taking over the Waukegan Facility, Isomedix merged with American Sterilizer Company ("AMSCO") which had itself already been subject to multiple product liability lawsuits related to EtO. Isomedix's SEC filings state that "[a]s of December 31, 1996, 11 product liability lawsuits related to AMSCO ethylene oxide ("EtO") sterilizers were pending." Many of the product liability lawsuits alleged that AMSCO was responsible for the plaintiffs' personal injuries resulting from toxic exposure to EtO.

34.     In 1996, the U.S. EPA issued its first model of EtO exposure concentrations for areas surrounding emitters. The 1996 model revealed that Lake County, Illinois residents had significantly greater EtO concentration exposure ($0.0085$ μg/m$^3$) than the national average ($0.00295$ μg/m$^3$), or over 2.8 times the average nationwide concentration. The 95th percentile of

modeled ethylene oxide exposure in Lake County (0.02176 μg/m³) was also *double* that of the national 95th percentile (0.01051μg/m³) of human exposure concentration.

35.     The U.S. EPA repeated its exposure concentration modeling by using reported emissions from 1999. The 1999 air modeling revealed that Lake County residents are at an increased risk of cancer from ethylene oxide and had a risk greater than 1.5 times the national cancer risk from ethylene oxide exposure.

36.     Thus, the potential dangers EtO emissions posed to nearby residents was known, or should have been known, to the Defendants by the time they operated their facilities, and years in advance of the Plaintiff's diagnosis.

## IV.     Lake County Facilities Emit Harmful Ethylene Oxide

### a.     The U.S. EPA Estimates High Risks of Cancer in Lake County

37.     On August 22, 2018, the U.S. EPA released the 2014 National Air Toxics Assessment ("NATA"). The NATA is a screening tool that estimates cancer risks based on emission data in 76,727 census tracts across the United States.

38.     The 2014 NATA revealed 109 census tracts in the United States with cancer risk scores greater than what the U.S. EPA considers "acceptable" limits: 100 cases for every 1 million people exposed to toxic air pollution during their lifetime. Of the 109 census tracts, the 2014 NATA identified four tracts in northern Illinois as having potential cancer risks of 100 in 1 million or greater from exposure to air toxics:

- Tract 17097862605/8626.05 (1.1 mi² near Waukegan, Park City): **157 per million**;

- Tract 17097862800/8628.00 (1.2 mi² near Waukegan, North Chicago): **131 per million**;

- Tract 17097861504/8615.04 (2.8 mi² near Gurnee, Park City): **123 per million**; and

- Tract 17097862604/8626.04 (1 mi² near Waukegan, Park City): **100 per million**.

39. The U.S. EPA released a statement that it believes that "largest sources of ethylene oxide emissions in Lake County are [Cosmed and Isomedix's successor,] Medline, a commercial sterilizer located in Waukegan, and Vantage, a chemical production facility in Gurnee."

40. The U.S. EPA estimates the lifetime risk of developing cancer due to air toxics in one of these four Lake County tracts near the Waukegan Facility and Gurnee Facility to be up to five times higher than average the national cancer risk across the U.S. population. Fewer than one percent of the census tracts in the United States have an estimated cancer risk due to air toxics of greater than or equal to 100 in one million.

**b.      The U.S. EPA's Cancer Risk Assessments are Understated**

41. While the 2014 NATA reveals shockingly high risks of cancer across a large area near the Waukegan and Gurnee Facilities, these risks are understated.

42. The U.S. EPA warns that the NATA is *only* a screening tool that local municipalities can use in order to further investigate the emission sources and potential public health risks. It notes several NATA shortcomings such as the lack of direct measurements of pollutants and data gaps.

43. The lifetime risk of developing cancer in the aforementioned census tracts is likely significantly higher than what the U.S. EPA estimated in the 2014 NATA. That is because Vantage's 2014 EtO emissions were actually *omitted* from the 2014 NATA. According to the U.S. EPA, this was due to a clerical "error" in the National Emissions Inventory which caused Vantage's 2014 EtO emissions to be calculated as zero for purposes of the 2014 NATA.[1] That is, the finding that cancer risk levels were up to five times the national average were based on the assumption that Vantage did not emit a single pound of EtO in 2014. Adding in the thousands of

---

[1]      https://www.epa.gov/il/ethylene-oxide-emissions-lake-county-illinois#vantage

pounds that Vantage actually emitted would only result in ever higher cancer risk levels for the areas surrounding the plant. In short, without the Vantage emissions in its calculations, the cancer risks identified in the 2014 NATA for people living and working in the area were and continue to be dramatically underestimated.

44.    Most importantly, the 2014 NATA is only a model created on an assumed exposure to a facility's reported emissions from a single year: 2014. But the emissions from the Gurnee Facility and Waukegan Facility have historically been much higher than their reported emissions in 2014.

45.    The U.S. EPA maintains a Toxics Release Inventory ("TRI") which includes annual self-reported emissions data from industrial facilities using EtO and other toxic chemicals which pose a threat to human health and the environment.

46.    A review of TRI data from the U.S. EPA shows EtO emissions from the Gurnee Facility over the past three plus decades, with a prominent increase of emissions beginning in 2010. *See* Figure 1.



**(Figure 1.)**

47.    While Vantage ultimately reported 2,723 pounds of EtO emissions in 2014, that

figure is overshadowed by its nearly 20,000 pounds emissions of EtO during a two-year period in 2010 and 2011. Similarly, Vantage reports emitting EtO in smaller, albeit significant quantities throughout the years:

- 2010: 9,649 pounds
- 2011: 9,709 pounds
- 2012: 3,425 pounds
- 2013: 2,832 pounds

- 2014: 2,723 pounds
- 2015: 1,277 pounds
- 2016: 1,127 pounds
- 2017: 1,547 pounds

48.     It is important to note that majority of Vantage's reported total emissions, as shown above, are the result of estimated "fugitive" emissions. To illustrate, Vantage's fugitive emissions constituted more than 80% of its total emissions in 2010 and 2011. In 2010, Vantage reported 9,649 pounds of total EtO emissions with 8,073 pounds of fugitive emissions and in 2011 Vantage reported 9,709 pounds of total EtO emissions with 7,984 pounds of fugitive emissions. Vantage's fugitive EtO emissions constitute a significant portion of its total emissions:

- 2010: 8,073 pounds
- 2011: 7,984 pounds
- 2012: 2,704 pounds
- 2013: 2,110 pounds

- 2014: 2,003 pounds
- 2015: 551 pounds
- 2016: 414 pounds
- 2017: 810 pounds

49.     Because of the elusive nature of these fugitive emissions, they are difficult to calculate, and are likely an underestimation. In fact, Vantage entered into a compliance agreement with the Illinois EPA regarding allegations that Vantage failed to test and maintain EtO-filtration equipment—which may have failed to achieve the required reduction in overall uncontrolled EtO emissions—in 2016.

50.     And although Vantage reported reductions in emissions after 2012, the facility's self-reported regulatory data is difficult to independently verify. For example, Vantage reported to another office at the U.S. EPA that during 2014 it released 6,412 pounds of EtO—**not 2,723 pounds as has been recently reported to the U.S. EPA**.

13

51.     Unfortunately, none of these emissions were used in calculating the cancer risks in the 2014 NATA, as mentioned above.

52.     The U.S. EPA's TRI data shows that emissions from the Waukegan Facility consistently exceeded 4,000 pounds of EtO between 1996 and 2001, including approximately 17,000 pounds between 1999 and 2001.

*See* Figure 2.



**(Figure 2.)**

53.     The TRI data does not display any emissions from the Waukegan Facility after 2005. Nonetheless, according to self-reported emissions data submitted to the Illinois EPA, the Waukegan Facility reported significant EtO emissions:

- 2006: 5,484 pounds
- 2007: 4,980 pounds
- 2008: 3,297 pounds
- 2009: 3,784 pounds
- 2010: 3,750 pounds
- 2011: 3,437 pounds

- 2012: 3,512 pounds
- 2013: 3,069 pounds
- 2014: 3,526 pounds
- 2015: 3,115 pounds
- 2016: 2,993 pounds
- 2017: 2,863 pounds

54.     These self-reported emissions to the Illinois EPA from the Waukegan Facility are *only* controlled emissions and do not include any estimates for fugitive emissions whatsoever.

14

55.     While Defendants have been knowingly releasing EtO for decades, people living and working in the surrounding community were unaware that the Defendants routinely exposed them to a dangerous, toxic, carcinogenic, and mutagenic gas.

**c.      Lake County Begins Air Monitoring**

56.     On August 21, 2018, the U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released a report of health risks related to the chemical release of EtO by Sterigenics, a commercial sterilizer 40 miles southwest in Willowbrook, Illinois. The ATSDR concluded that an elevated cancer risk existed for residents and off-site workers in the Willowbrook community surrounding the Sterigenics facility due to EtO.

57.     In the following months, Lake County officials, health departments, state and national elected representatives, and concerned residents repeatedly pleaded with the U.S. EPA and Illinois Environmental Protection Agency ("IEPA") to conduct ambient air monitoring surrounding the Waukegan and Gurnee Facilities. Despite these requests, the U.S. EPA and IEPA refused to conduct ambient air monitoring anywhere in Lake County, much less near the Waukegan and Gurnee Facilities.

58.     Finally, on May 20, 2019, local community officials approved an intergovernmental agreement between the Village of Gurnee, City of Waukegan, and Lake County to conduct air monitoring.

59.     The air monitoring began on June 3, 2019 by placing cannisters at four sites near the Waukegan Facility, four sites near the Gurnee Facility, and two remote locations in Lake County. The Lake County Health Department released partial test results on June 21, 2019 that revealed the presence of EtO in almost every sample. The test results also showed the presence of EtO as far as 4.5 miles from the Waukegan Facility and 4 miles from the Gurnee Facility. The air

15

monitoring cannisters surrounding Waukegan and Gurnee Facilities registered elevated levels of EtO with the highest twenty-four hour reading at ten micrograms of ethylene oxide per cubic meter of air (10 ug/m³).

60.     For reference, the U.S. EPA associates a concentration of ethylene oxide of 0.02 ug/m³ with a 100-in-a-million cancer risk for a lifetime of exposure. The highest recorded EtO concentration surrounding the Waukegan and Gurnee Facilities corresponds with a cancer risk as high as 500 times the EPA's 100-in-a-million cancer risk.

61.     On November 26, 2019 the Lake County Health Department received the first set of air monitoring test results from the second phase of air testing that took place between October 26, 2019 and November 2, 2019.

62.     Air test results confirm the June 2019 findings. That is, ethylene oxide has been detected in high concentration in communities around the Waukegan and Gurnee Facilities, and in remote locations away from both facilities.

63.     Lake County's final phase of air monitoring started in April 2020 and after Cosmed and Isomedix's successor supposedly installed new air emission controls. The air monitoring canisters registered EtO levels over 53 times the EPA's 100-in-a-million cancer risk in remote locations and as high as 0.92 μg/m³ near the Waukegan Facility—representing EtO levels 43 times the EPA's 100-in-a-million cancer risk—and as high as 5.49 μg/m³ near the Gurnee Facility—representing EtO levels over 274 times the EPA's 100-in-a-million cancer risk.

64.     The full extent of EtO emissions throughout Lake County was unknown to those living and working in the area until Lake County released the air monitoring test results. Indeed, the local air monitoring tests revealed a more accurate picture of EtO concentrations and the distance EtO has traveled than the U.S. EPA's NATA report. And the air monitoring tests revealed

16

areas in Lake County with high EtO concentrations that were previously not indicated by the 2014 NATA report.

65.     Even still, the full health impact on those who live and work near the Waukegan and Gurnee Facilities is still not entirely known. The Lake County Health Department has requested that the Illinois Department of Public Health conduct a cancer incidence assessment in Lake County.

## FACTS SPECIFIC TO HATTIE PHELPS

66.     Plaintiff Hattie Phelps has been a resident of the Lake County area since around 1975. From around 1975 to 1976, she lived within approximately 5.0 miles of the future location of the Gurnee Facility and 2.2 miles of the future location of the Waukegan Facility. From around 1976 to 1981, she lived within approximately 4.3 miles of the future location of the Gurnee Facility and 1.8 miles of the future location of the Waukegan Facility. From around 1981 to 1991, she lived approximately 4.7 miles from the Gurnee Facility and 1.9 miles from the Waukegan Facility. From around 1991 to present, she has lived approximately 4.3 miles from the Gurnee Facility and 1.4 miles from the Waukegan Facility. From around 1988 to 2007, she lived approximately 4.6 miles from the Gurnee Facility and 1.5 miles from the Waukegan Facility.

67.     Plaintiff consistently inhaled contaminated air in and around her home and in the Lake County area.

68.     Because of her inhalation of EtO from Defendants' facilities, Plaintiff was diagnosed with breast cancer.

69.     Plaintiff, having exercised reasonable diligence, first learned that Plaintiff's injury was wrongfully caused on a date less than two years prior to the filing of this complaint.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and Against Defendants)**

70.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

71.     At all times relevant, Defendants owed a duty to exercise reasonable care in the operation of their facilities, including in their emission of EtO, to prevent harm to neighboring Plaintiff. It was reasonably foreseeable that nearby property owners would be exposed to elevated levels of Defendants' EtO emissions, and would face the health risks associated with EtO exposure.

72.     Notwithstanding their duty, Defendants breached their duty in one or more of the following ways:

      a.     Emitting dangerous volumes of EtO into the air;

      b.     Disregarding safe methods to adequately control EtO emissions;

      c.     Failing to warn or advise those who live or work in the community, that they were being exposed to EtO;

      d.     Failing to adequately record test results of high levels of EtO;

      e.     Ignoring test results of high levels of EtO;

      f.     Underreporting EtO levels; and

      g.     Subjecting those who live and work near their facilities to an elevated cancer risk.

73.     As a proximate result of one of the aforesaid negligent acts or omissions Plaintiff Hattie Phelps suffered injuries of a personal and pecuniary nature.

WHEREFORE Plaintiff Hattie Phelps demands judgment against Defendants in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT II
### Willful and Wanton Conduct
### (On Behalf of Plaintiff and Against Defendants)

74.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

75.     At all times relevant, Defendants owed a duty to refrain from willful and wanton conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of the Plaintiff and those living and working in the area surrounding their facilities.

76.     Notwithstanding their duties, Defendants breached their duties in one or more of the following ways:

      a.     Emitting dangerous volumes of EtO into the air;

      b.     Disregarding safe methods to adequately control EtO emissions;

      c.     Failing to warn or advise those who live or work in the community, that they were being exposed to EtO;

      d.     Failing to adequately record test results of high levels of EtO;

      e.     Ignoring test results of high levels of EtO;

      f.     Underreporting EtO levels; and

      g.     Subjecting those who live and work nearby their facilities to an elevated cancer risk.

77.     As a proximate result of one of the aforesaid willful and wanton acts or omissions, Plaintiff Hattie Phelps suffered injuries of a personal and pecuniary nature.

WHEREFORE Plaintiff Hattie Phelps demands judgment against Defendants in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT III
### Public Nuisance
### (On Behalf of Plaintiff and Against Defendants)

78.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

79.     At all relevant times, Defendants have known EtO to be hazardous and harmful to humans.

80.     The general public has a common right to breathe clean air without dangerous levels of carcinogens such as EtO. The Illinois Constitution guarantees these rights to its citizens. Article XI of the Illinois Constitution of 1970, Environment, Section 1, Public Policy - Legislative Responsibility, provides that:

> The public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

Article XI of the Illinois Constitution of 1970, Environment, Section 2, Rights of Individuals, provides that:

> Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law.

81.     Defendants' use and emission of EtO from their facilities substantially and unreasonably infringes upon and/or transgresses this public right.

82.     Defendants knew and should have known that the EtO they emitted would have a toxic, poisonous, and deleterious effect upon the health, safety, and well-being of persons inhaling it, including people living and working in the community.

83.     Defendants' operation, maintenance, and use of their facilities caused those who live and work in the area surrounding their facilities to breathe air containing high levels of EtO on a routine basis, causing a substantially elevated risk of cancer.

84.     As a proximate result, Plaintiff's and the general public's common right to breathe clean air without dangerous levels of carcinogens such as EtO was eliminated and/or severely diminished.

85.     As a proximate result, EtO invaded and caused to be contaminated the areas immediately surrounding and on Plaintiff's residence.

86.     As a proximate result, Plaintiff was exposed to and inhaled significant quantities of EtO.

87.     As a proximate result, Plaintiff sustained and will continue to sustain severe and permanent damage to her health due to the emission of EtO.

88.     As a proximate result, Plaintiff Hattie Phelps suffered injuries of a personal and pecuniary nature.

WHEREFORE Plaintiff Hattie Phelps demands judgment against Defendants in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.

## COUNT IV
### Ultrahazardous Activity/Strict Liability
### (On Behalf of Plaintiff and Against Defendants)

89.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

90.     Defendants' use and emission of EtO from their facilities constitutes an ultra-hazardous activity.

91.     Defendants' use and emission of EtO created a high degree of risk to those who live and work and the surrounding area. As EtO is carcinogenic, exposure to it at any level is inherently dangerous, and Defendants emitted tons of it into the air around their properties.

92.     Defendants' use and emission of EtO is especially inappropriate given the densely populated residential and commercial area in which their facilities are located. Medical device sterilization is not an activity regularly undertaken by individuals in the population.

93.     The activities conducted by Defendants are exceedingly dangerous as described herein and offer little to no value to the surrounding community.

94.     Because the activities of Defendants are ultrahazardous, Defendants are strictly liable for any injuries proximately resulting therefrom.

95.     As a direct and proximate result of Defendants' ultrahazardous activities, Plaintiff was exposed to and inhaled significant quantities of EtO.

96.     As a proximate result of Plaintiff's inhalation of EtO from the Defendants' facilities, Plaintiff Hattie Phelps suffered injuries of a personal and pecuniary nature.

WHEREFORE Plaintiff Hattie Phelps demands judgment against Defendants in an amount in excess of the minimum amount required for jurisdiction in the Law Division of the Circuit Court of Cook County, Illinois.


Respectfully submitted,

HATTIE PHELPS,

Date: May 29, 2024                    By: /s/ Brandt Silver-Korn
                                      One of Plaintiff's Attorneys

                                      Jay Edelson
                                      jedelson@edelson.com
                                      Benjamin H. Richman
                                      brichman@edelson.com
                                      Amy Hausmann
                                      abhausmann@edelson.com
                                      Schuyler Daum*
                                      sdaum@edelson.com

EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
312.589.6370
Firm ID: 62075

Todd Logan*
tlogan@edelson.com
Brandt Silver-Korn
bsilverkorn@edelson.com
Lauren Blazing*
lblazing@edelson.com
EDELSON PC
150 California St, 18th Floor,
San Francisco, CA 94111
415.212.9300

*Admitted Pro Hac Vice into consolidated
lead action